**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BART KARLSON, Individually, and on behalf of all others similarly situated, and on behalf of the CONAGRA BRANDS RETIREMENT INCOME SAVINGS PLAN, | Case No: 1:18-cv-8328 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| CONAGRA BRANDS INC.; CONAGRA BRANDS INC. EMPLOYEE BENEFITS ADMINISTRATIVE COMMITTEE; CONAGRA BRANDS APPEALS COMMITTEE; WILLIAM RYAN EGAN; and DOES NO. 1-10, Whose Names Are Currently Unknown, | |
| Defendants. | |

## I.     INTRODUCTION

1.      This case arises from the Defendants' (defined below) refusal to pay benefits to Plaintiff ("Plaintiff" or "Karlson") pursuant to the express terms of the ConAgra Brands Retirement Income Savings Plan f/k/a ConAgra Foods Retirement Income Savings Plan (the "ConAgra Plan" or the "Plan").  Defendants base their denial on a "reinterpretation" of the Plan that violates the Plan's clear language, as well as the way Defendants have interpreted and applied the Plan for years.  Defendants' purported "reinterpretation" of the Plan was motivated by their desire to save money.  However, by wrongfully denying millions of dollars in benefits to a large number of Plan participants and their beneficiaries, Defendants have violated their fiduciary and other legal duties.

2.      The Plan had more than $1.4 billion in assets as of December 2015 and almost

13,000 participants.  Defendants are the Plan's fiduciaries: the Plan Sponsor ConAgra Brands

Inc. ("ConAgra," f/k/a ConAgra Foods Inc. and ConAgra Inc.); ConAgra Brands Inc. Employee

Benefits Administrative Committee f/k/a ConAgra Foods, Inc. Employee Benefits

Administrative Committee ("Administrative Committee"); ConAgra Brands Appeals Committee

("Appeals Committee"); William Ryan Egan ("Ryan Egan" or "Egan"); and DOES No. 1-10,

who are or were members of the Administrative Committee and/or Appeals Committee at any of

the pertinent times and whose names are currently unknown (collectively, with ConAgra, the

Administrative Committee, the Appeals Committee, Egan, and Does No. 1-10, "Defendants").[1]

Karlson is one of the terminated employees and was a Plan participant.

3.      Karlson brings this action on behalf of himself, all other similarly-situated Plan

participants and beneficiaries (collectively, the "Class," as defined in detail below), and the Plan,

to recover the benefits due to Karlson and the Class under the terms of the Plan; to enforce his

and the Class's rights under the terms of the Plan; to hold Defendants liable to the Plan for their

breaches of fiduciary duties; for injunctive and declaratory relief; and for all other appropriate

relief under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et*

*seq.*.

## II.      THE PARTIES

4.      Karlson is a participant under the ConAgra Plan, which is a defined contribution,

individual account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and §1002(34).

Karlson is a resident and citizen of Eustis, Florida, and was employed by ConAgra from around

February 2007 to April 2016.  Karlson was the Senior Director of Global Benefits until ConAgra

---

[1] Conagra Foods, Inc. was restructured into two entities, Conagra Brands Inc. and Lamb Weston in November 2016.

terminated his employment in April 2016. He was also a member of the Administrative Committee until his termination.

5.      ConAgra is a Delaware corporation with its current headquarters in Chicago, Illinois. ConAgra is the Plan sponsor and a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.

6.      The Administrative Committee has the full and complete authority, responsibility, and control over the management, administration, and operation of the Plan pursuant to the Plan Document; is a named fiduciary under the Plan and the Plan Administrator; administers the Plan; and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102. The Administrative Committee maintains its address at ConAgra's headquarters in Chicago, Illinois. The Administrative Committee and its members are appointed by ConAgra to administer the Plan on ConAgra's behalf.

7.       Upon information and belief, the Appeals Committee is a fiduciary with the discretion and authority to review and decide benefit claims. 29 U.S.C. §§ 1002, 1102. The Appeals Committee maintains its address at ConAgra's headquarters in Chicago, Illinois.

8.      Egan is the Vice President of Human Resources at ConAgra, a member of the Administrative Committee and the Appeals Committee, and, by virtue of his membership, is a fiduciary of the Plan.

9.      Defendants Does Nos. 1-10 are members of the Administrative Committee and Appeals Committee and, by virtue of their memberships, are fiduciaries to the Plan. Karlson is currently unable to determine the membership of the Administrative Committee and Appeals Committee despite reasonable and diligent efforts, as it appears that the membership of those committees is not provided to the public. As such, these defendants are named Does 1-10 as

placeholders, and Karlson will move, pursuant to Rule 15 of the Federal Rules of Civil

Procedure, to amend this Complaint to name the members of the Administrative Committee and

Appeals Committee as defendants as soon as their identities are discovered.

### III.    JURISDICTION AND VENUE

10.      Karlson seeks relief on behalf of himself, all others similarly situated, and the

Plan, pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other

interested persons under ERISA Section 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

11.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 because this action arises under the laws of the United States.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Plan is

administered in this District, the breach or violation took place in this District, and one more

Defendant resides in this District.

### IV.    BACKGROUND FACTS

13.      On or about October 1, 2015, ConAgra announced that it would lay off

approximately 30% of its global, office-based workforce as part of what it described as an

"efficiency 'plan,'" which was meant to result in at least $300 million in cost savings for

ConAgra over the next three years.

14.      The announcement came as ConAgra moved forward with plans to sell its private

label business, which was losing money and underperforming despite ConAgra's heavy

investment, including a $5 billion purchase of Ralcorp, a private label manufacturer, in January

2013. ConAgra would eventually sell all of its private brands operations, including those

existing prior to its acquisition of Ralcorp, in February 2016, at a loss of approximately $2.7

billion plus transaction expenses.

15.     As a result of this restructuring, Karlson was terminated from his position as Senior Director of Global Benefits with ConAgra, effective April 1, 2016.

A.     **THE RELEVANT PLAN PROVISIONS CONCERNING PARTICIPANT CONTRIBUTIONS**

16.     Pursuant to the Plan Document, Plan participants may make the following contributions to the Plan:

a. **Pre-Tax Contribution.**  Pursuant to Section 3.01(a) of the Plan Document, participants may make a pre-tax contribution of no less than 1% and no more than 25% of their Compensation (as defined in the Plan Document and explained below) or 15% for highly compensated employees, for an Accounting Year (as defined in the Plan Document and explained below); and

b. **After-Tax Contribution.**  Pursuant to Section 3.01(b) of the Plan Document, participants may make an after-tax contribution of not less than 1% and no more than 10% of their Compensation for an Accounting Year.

17.     Pursuant to Section 3.02 of the Plan Document, ConAgra is required to make a matching contribution of, depending on the employee's hiring date, (1) 50% of the employee's contributions, up to 6% of an employee's Compensation; (2) 66 2/3% of the employee's contributions, up to 6% of an employee's Compensation; or (3) 100% of an employee's contributions, up to 6% of an employee's Compensation.  For former Ralcorp employees and employees hired after August of 2013, the company also made a non-elective contribution of 3% of an employee's Compensation.

18.     Pursuant to Section 1.11 of the Plan Document, Compensation includes payments made by the <u>later</u> of (i) 2.5 months after severance from employment, <u>or</u> (ii) the end of the calendar year that includes the date of severance, <u>if the payments are payments that, absent a</u>

severance from employment, would have been paid to the participant while the participant continued in employment with ConAgra and are bonuses.[2]

19.     Pursuant to Section 1.01 of the Plan Document, "Accounting Year," as relevant here, is defined as the period beginning on January 1 of each year and ending the following December 31.

### B.     KARLSON'S POST-TERMINATION CONTRIBUTIONS

20.     Following his termination effective April 1, 2016, Karlson maintained a valid deferral election for a Pre-Tax Contribution under the Plan during 2016, with a pre-tax deferral percentage equaling 15% of his Compensation.  Karlson did not have an after-tax election on file.

21.     On or about July 15, 2016, ConAgra paid Karlson a bonus pursuant to the Fiscal Year 2016 ConAgra Foods Business Management Incentive Plan ("MIP"), which, pursuant to Section 1.11, is "Compensation" he would have received if he had continued his employment with ConAgra.

22.     Pursuant to Sections 1.11 and 3.01(a) of the Plan Document and Karlson's deferral election, Defendants should have deferred 15% of Karlson's MIP bonus to the Plan.

23.     Pursuant to Section 3.02 of the Plan Document, ConAgra had the obligation to match that contribution, subject to the limitations set forth in Section 3.02 of the Plan Document.

24.     Defendants failed to follow the Plan provisions on participant contributions with respect to the MIP bonus Karlson received on or about July 15, 2016.  Thus, it did not defer 15% of Karlson's MIP bonus to the Plan and it did not match that contribution.

---

[2]  Section 3.05 defines "limitation year" as the calendar year.

## V.     KARLSON'S EXHAUSTION OF ADMINISTRATIVE REMEDIES

25.     On April 11, 2018, after discovering Defendants' failure to follow the Plan provisions on participant contributions with respect to his MIP bonus, Karlson filed a claim with the Executive Vice President, Chief Human Resources Officer pursuant to the Claims Procedure provided in Section 7.03 of the Plan Document for the benefits he was due under the Plan ("Claim Letter").

26.     In his Claim Letter, Karlson quoted the definition of "Compensation" and "Accounting Year" under Sections 1.11 and 1.01, respectively, of the Plan Document, discussed the contradictory explanations he received from the Plan's administrative representatives, and explained that the Plan's failure to follow his deferral election and resulting lack of employer matching contradicted the Plan Document.  *See id.*

27.     In response, Karlson received a letter from Egan dated May 4, 2018 (the "Claim Denial Letter"), which denied Karlson's benefits claim "on behalf of the Plan."  In his letter, Egan explained, in relevant part:

> For a period prior to 2016, administrative practice allowed bonuses paid later in the year to be eligible for deferral under the Plan if the participant terminated employment prior to the bonus payment date, using the term "Eligible Employee" broadly.  Under the prior interpretation, manual overrides were required to reinstate elections, process the deferral and return the file to a terminated state. *For 2016 and later, this administrative interpretation was narrowed to achieve operational efficiencies and stability.  The terms of the Plan continued to be followed; the administrative interpretation of who is eligible to make elective deferrals was adapted to only include active participants who terminated* [*sic*] *within 2-1/2 months of the MIP bonus payment.*  All similarly situated participants were treated the same.
>
> The Plan was administered in accordance with its terms and the Committee's interpretation of those terms.

(Emphasis added.)  The Claim Denial Letter also informed Karlson that he could appeal the denial to the "Plan Administrator" in writing addressed to the "Appeals Committee." *Id.*

7

28.     Pursuant to Section 7.03 of the Plan Document and the instructions from Egan in the Claim Denial Letter, Karlson appealed his claim denial on May 24, 2018 (the "Appeal Letter").

29.     In his Appeal Letter, Karlson emphasized that the "administrative interpretation" that Egan referred to in the Claim Denial Letter contradicted the terms of the Plan.  Karlson requested that, in the event there was continued disagreement with respect to his benefits claim, that there be:

>   a.  An explanation for the denial with specific examples of plan language from the Plan Document;
>
>   b.  A legal opinion letter from 2016 with respect to the new "interpretation," if it exists;
>
>   c.  An explanation as to how the policy change was implemented and who was included in that decision process; and
>
>   d.  A production of the Administrative Committee's meeting minutes that spoke to and contemplated the change.

Ex. C.

30.     Karlson then received a letter from Egan dated July 9, 2018, who, this time on behalf of the "Appeals Committee," rejected Karlson's appeal (the "Appeals Denial Letter").  In his letter, Egan explained:

>   As communicated in the May claim denial letter, the administrative procedure for post-termination bonus payments was changed in 2016 to only apply elective deferral deductions to MIP bonuses paid within 2-1/2 months after separation from service.  *The Plan was not amended because the change related to the administrative interpretation of existing Plan language.*  Section 3.01 of the Plan (attached) states that "Eligible Employees" may specify a deferral rate for payroll deductions.  *In 2016, administration changed to interpret "Employee" more literally.*  Former employees were only allowed to defer MIP bonuses if they separated from service after May 1, not if they separated from service earlier in the calendar year (which was the procedure in 2015).
>
>   For a period prior to 2016, administrative practice allowed MIP bonuses to be eligible for deferral under the Plan if the participant separated from service at any

> time that calendar year before the bonus payment date, using the term "Eligible Employee" broadly. For 2016 and later, this administrative interpretation was narrowed to achieve operational efficiencies and stability, as well to move toward a plain meaning of "employee."
>
> Based on Section 3.01 of the Plan (consistent with the "Depending your employment status…" language on page 7 of the Summary Plan Description), participants would normally not expect an inclusion of post-termination MIP bonuses. (Given your position as Senior Director of Benefits, you would have been uniquely positioned to be aware of the prior process, unlike most employees.) Therefore, *the Plan was not amended because the change related to administrative interpretation of existing Plan language*.

(Emphasis added.) Defendants' denial of Karlson's claim had no reasonable basis and contradicted the express terms of the Plan. Egan's explanation in the Appeals Denial Letter— that the "interpretation" of the term "Eligible Employee" was "narrowed"—is erroneous and cannot alter Karlson's post-separation contribution rights under the Plan Document.

31.     Section 1.11 of the Plan Document clearly contemplated a participant's post-separation right to continue contributing to the Plan. Section 1.11 provided that a participant could defer a portion of his or her bonus payment if: (1) the participant would have received the bonus had he or she continued in employment with ConAgra; and (2) the bonus payment was made by the later of (i) 2.5 months after severance from employment or (ii) the end of the calendar year. Karlson met those requirements.

32.     Moreover, contrary to Egan's explanation in both the Claim Denial Letter and the Appeals Denial Letter, the interpretation of the definitions of "Employee" or "Eligible Employee" has no effect on the post-separation contribution rights of Karlson or other Plan participants. Section 1.11 of the Plan Document provides for a "Participant's" right to contribute a portion of his "Compensation." It does not use the term "Eligible Employee" or "Employee's" right to contribute a portion of his "Compensation." Furthermore, the Plan Document's definition of "Participant" contemplates and includes former employees:

> Section 1.27 "Participant**"** means an Eligible Employee who has satisfied the requirements set forth in Article II for participation hereunder and either has enrolled in the Plan or is deemed to be a Participant under Section 3.01 *or a former Eligible Employee with an Account in the Plan.*

(Emphasis added.)

33.     The Appeals Denial Letter also contradicted the Claim Denial Letter and admitted that Defendants had not followed the Plan terms when the Plan adopted the new and "narrow" interpretation of a participant's post-separation contribution rights. As Egan himself pointed out in the Claim Denial Letter, pursuant to Section 7.02 of the Plan Document, it is the Administrative Committee that has the "sole and absolute discretion to: (i) construe and interpret the Plan. " However, the Administrative Committee did not exercise its discretion to adopt the new interpretation of a Plan participant's post-separation rights.

34.     Instead, as Egan admits in his Appeals Denial Letter that the new and "narrow" interpretation was made "without analysis" or a formal "decision" by the Administrative Committee:

> You asked for the Employee Benefits Administrative Committee ("EBAC") minutes addressing this change. As previously expressed, this change was administrative in nature, and did not require analysis by or a decision from the EBAC.

Ex. D. In other words, the Appeals Denial Letter made it clear that, contrary to Section 7.02 of the Plan Document, the Administrative Committee did not consider or exercise any discretion to interpret the Plan. Further, Defendants failed to disclose who actually made the "administrative decision" to disregard the express terms of the Plan and cut back the benefits of Karlson and similarly situated participants.

35.     The Appeals Denial Letter told Karlson that his administrative remedies had been exhausted and that he could bring an action in federal court:

> You now have the right to bring a civil action under ERISA Section 502(a) in federal court if you choose to further pursue this claim, but you must comply with the applicable statute of limitations. If you decide that you would like to further pursue this claim, you must bring a civil action in federal court.

Ex. D.

## VI.   DEFENDANTS' CONFLICTS OF INTEREST

36.     The Plan's adoption of the new and **"narrow"** interpretation of a participant's post-separation contribution rights in 2015 was improper, and it was the result of a conflict of interest between Defendants, on the one hand, and Karlson and other separated participants, on the other.

37.     As noted above, pursuant to Section 3.02 of the Plan Document, ConAgra is required to make a matching contribution for a portion of the income that separated participants like Karlson defer to the Plan. There is already minimal incentive for ConAgra to make a matching contribution to participants whose employment relationships with ConAgra have been terminated. This was particularly true in 2015 and later, after ConAgra laid off 30% of its workforce in an effort to rectify its financial problems and to reduce costs. Indeed, the fact that the new and narrow interpretation of the Plan was made in 2015—at or around the time that ConAgra laid off approximately 30% of its workforce—indicates that a primary motivation for the change was ConAgra's desire to reduce its expenses and improve its financial performance.

38.     The Defendants breached their duty of loyalty and obligation to act in the best interests of the Plan participants by placing ConAgra's financial interests ahead of the participants' interests in receiving their benefits under the Plan.

39.     The Administrative Committee, the Appeals Committee, and their members, including Egan, are appointed by ConAgra and are employees of ConAgra. As a result, they have an interest in furthering ConAgra's objectives, such as reducing expenses to improve

ConAgra's financial performance.  It was this conflict of interest that resulted in the adoption and application of the new and "narrow" interpretation of participants' post-separation contribution rights and the denial of Karlson's benefits claim.

## VII.   ERISA'S FIDUCIARY STANDARDS

40.     ERISA Section 404 provides, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

. . .

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a).

## VIII.   CLASS ALLEGATIONS

41.     This action is brought as a class action by Karlson on behalf of himself and on behalf of the Class, defined as follows:

Class

All current and former participants of the ConAgra Brands Retirement Income Savings Plan f/k/a ConAgra Foods Retirement Income Savings Plan who separated from their employment with ConAgra Brands Inc. or its predecessor and/or related entities, had a valid deferral election on or after January 1, 2015, and received a MIP bonus in or after 2015.

Excluded from the Class is the Judge(s) to whom this case is assigned and any other judicial officer having responsibility for this case.

42.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

43.     <u>Numerosity</u>.  Plaintiff is informed and believes that there are at least several thousand Class members throughout the United States. As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

44.     <u>Commonality</u>.  There are numerous questions of fact and/or law that are common to Plaintiff and all members of the Class, including, but not limited to the following:

a.     Whether the Plan Document requires Defendants to apply the deferral elections of Plaintiff and the Class to the MIP bonuses they received on or after January 1, 2015;

b.     Whether Defendants improperly denied the benefits claims made by Plaintiff and the Class for their MIP bonuses received on or after January 1, 2015 on the basis of the Plan's new interpretation of a participant's post-separation contribution rights in 2015;

c.     Whether Defendants acted as fiduciaries to the Plan under ERISA when the Plan adopted the new interpretation of a participant's post-separation contribution rights in 2015;

d.     Whether Defendants breached their fiduciary duties under ERISA when the Plan adopted the new interpretation of a participant's post-separation contribution rights in 2015;

e.     Whether Defendants breached their fiduciary duties under ERISA by failing to apply the deferral elections of Plaintiff and the Class to the MIP bonuses they received on or after January 1, 2015; and

f.     Whether and what form of relief should be afforded to Plaintiff and the Class.

45.     Typicality.  Plaintiff, a member of the Class, has claims that are typical of all of the members of the Class.  Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

46.     Adequacy of Representation.  Plaintiff will fairly and adequately represent the interests of the members of the Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

47.     Predominance.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar certification.

48.     Superiority.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation. Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

49.     Manageability.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

50.     Defendants have acted on grounds generally applicable to the Class by uniformly subjecting Class members to their policy of refusing to apply the deferral elections of the Class to the MIP bonuses they received on or after January 1, 2015.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

## COUNT I
## Recovery Of Benefits – ERISA § 502(a)(1)(B)

51.     Plaintiff restates and re-alleges the foregoing paragraphs as if fully set forth herein.

52.     ERISA § 501(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorities a participant or beneficiary of a plan to bring a civil action to recover benefits due under the terms of the plan, to enforce his rights under the terms of the plan, and to clarify his rights to future benefits under the plan.

53.     Pursuant to the Plan Document, Plaintiff and the Class were entitled to contribute the MIP bonuses they received on or after January 1, 2015 to the Plan based on their deferral elections, and receive benefits based on those contributions.

54.     Accordingly, Plaintiff asserts this claim on behalf of himself and the Class to enforce their rights under the terms of the Plan and to recover those benefits due to them under the terms of the Plan.

<u>**COUNT II**</u>
**Breach of Fiduciary Duty – ERISA § 502(a)(2)**

55.      Plaintiff restates and re-alleges the foregoing paragraphs as if fully set forth herein.

56.      Defendants are fiduciaries to Plaintiff and the Class under ERISA § 3(21)(A), 29 U.S.C. 1002(21)(A), based on the discretionary authority and responsibilities they assumed and/or were granted for administering the Plan.

57.      ERISA § 502(a)(2) authorizes a participant or beneficiary to bring a civil action to obtain appropriate relief for breaches of fiduciary duty on behalf of a plan to hold the breaching fiduciary personally liable to make good to such plan any losses to the plan resulting from each such breach and any other equitable or remedial relief as the court may deem appropriate.

58.      Defendants reinterpreted and administered a Plan participant's post-separation contribution rights to benefit the Plan sponsor, to the detriment of Plan participants and beneficiaries.

59.      In so doing, Defendants have failed to discharge their duty to act "solely in the interest of the participants and beneficiaries" and exclusively for the purpose of providing and administering benefits to Plan participants and beneficiaries.

60.      In addition, Defendants' reinterpretation and administration of a Plan participant's post-separation rights contradicted the Plan Document.

61.      In so doing, Defendants also failed to act in accordance with the documents and instruments governing the Plan.

62.      Defendants also failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing of a prudent man acting in a like capacity.

63.     As a result, the Plan has suffered losses from, *inter alia*, the contributions from Plaintiff and the Class, the matching contributions from the Plan sponsor, and the profits those contributions would have accrued as Plan assets.

64.     Accordingly, Plaintiff asserts this claim on behalf of himself and the Class, and on behalf of the Plan, to hold Defendants personally liable to make good to the Plan the losses resulting from their breaches of fiduciary duties, as well as declaratory and injunctive relief to enjoin the illegal practices of Defendants described herein, and to obtain such appropriate equitable relief as may be necessary under the circumstances.

### COUNT III
### Breach of Fiduciary Duty – ERISA § 502(a)(3)

65.     Plaintiff restates and re-alleges the foregoing paragraphs as if fully set forth herein.

66.     ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

67.     Pursuant to the Plan Document, Plaintiff and the Class were entitled to contribute a portion of their MIP bonuses they received on or after January 1, 2015, to the Plan based on their deferral elections, and receive benefits based on those contributions.

68.     Defendants refused and continue to refuse comply with the terms of the Plan with respect to Plaintiff and the Class's rights to contribute a portion of their MIP bonuses to the Plan based on their deferral elections, and receive benefits based on those contributions.

69.     Accordingly, Plaintiff seeks declaratory and injunctive relief on behalf of himself and the Class to enjoin the illegal practices of Defendants described herein, and to obtain such other appropriate equitable relief as may be necessary under the circumstances recognizing their rights to those benefits.

WHEREFORE, Plaintiff, on behalf of himself, the Class, and the Plan, demands judgment against Defendants, for the following relief:

(a)     an Order declaring this action to be maintainable as a class action and appointing Plaintiff as the representative of the Class and his counsel as counsel for the Class;

(b)     a declaratory judgment that Defendants have breached their fiduciary duties to Plaintiff and the Class, in violation of 29 U.S.C. § 1104;

(c)     an order enjoining Defendants from continuing to engage in the breaches of fiduciary duty and violations of law described herein;

(d)     an accounting to the Plan of the monies that would have been contributed to the Plan and the profits such monies would have generated but for Defendants' breaches of their fiduciary duties;

(e)     disgorgement, restitution, and/or restoration to the Plan of the monies that would have been contributed to the Plan and the profits such monies would have generated but for Defendants' breaches of their fiduciary duties;

(f)     payment of the benefit claims made by Plaintiff and the Class;

(g)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(h)     Attorneys' fees, costs, and other recoverable expenses of litigation; and

(i)      Such further and additional relief to which Plaintiff, the Class, and the Plan may

be justly entitled and the Court deems appropriate and just under all of the circumstances.

Date:  December 19, 2018

**NOVACK AND MACEY LLP**

By: /s/ Mitchell L. Marinello
        One of Plaintiff's Attorneys

Ronald S. Kravitz
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone: (415) 429-5272
Facsimile:  (866) 300-7367
Email: rkravitz@sfmslaw.com

*Local Counsel:*
Mitchell L. Marinello
Richard G. Douglass
Novack and Macey LLP
100 N. Riverside Plaza
Chicago, IL  60606
Telephone:  (312) 419-6900
Facsimile:  (312) 419-6928
Email:  mmarinello@novackmacey.com

## <u>NOTICE PURSUANT TO ERISA § 502(h)</u>

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: December 19, 2018        Respectfully submitted,

**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**

/s/ Ronald S. Kravitz
One of the Attorneys for Plaintiff

Ronald S. Kravitz
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone: (415) 429-5272
Facsimile: (866) 300-7367
Email: rkravitz@sfmslaw.com